J-S04041-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DEREK PATTERSON, ADMINISTRATOR OF THE ESTATE OF MARTHA TINGLE, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1479 EDA 2025 |
| LYNN G. TURCHIN, ROBERT H. TURCHIN, AND M&T BANK A/K/A MANUFACTURERS & TRADERS TRUST COMPANY | : : : : : | |

Appeal from the Judgment Entered June 5, 2025
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 240302831

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.: **FILED APRIL 8, 2026**

Appellant, Derek Patterson, Administrator of the Estate of Martha Tingle, deceased, appeals from the trial court's judgment entered following a non-jury trial in favor of Appellees, Lynn G. Turchin, Robert H. Turchin, and M&T Bank a/k/a Manufacturers & Traders Trust Company ("M&T").[1] We affirm.

The trial court summarized the background of this case as follows:

**FACTS**

On December 28, 1978, Preston Williams … and Martha Tingle … purchased the real property located at 1000 S. Colorado St., Philadelphia, PA 19146 (hereinafter "the Property"). Williams and Tingle ceased tax payments in 1985. Williams died on September

_____

[1] Lynn and Robert Turchin are husband and wife. **See** Findings of Fact and Conclusions of Law ("FFCL"), 5/15/25, at ¶¶ 10-11.

20, 1992. Williams died with a will, and an estate was raised shortly after his death. Tingle died on March 25, 1995. No estate was raised for Tingle at that time. When … Tingle died, she was living at 1022 S. Colorado St., just a few houses down the street from the Property.[1]

[1] The 1022 S. Colorado St. property remained in the Tingle/Williams family at least through June 2005.

On May 10, 2005, a deed was filed that purported to convey the Property from Williams and Tingle to For the People Housing, LLC. All parties agreed that this deed was fraudulently recorded[ and that the signatures of Williams and Tingle on the May 10, 2005 deed were forged.] On July 27, 2005, For the People Housing, LLC[,] conveyed the property to Loni Lassoff…. Lassoff obtained a vacant residential lot license on September 14, 2005, and she paid off the back taxes on October 4, 2005.

Lassoff sold the still vacant lot to BHD Realty Group, LLC ("BHD")[,] on September 14, 2006. Also on September 14, BHD took out an open-ended mortgage on the Property through Northern Funding. In June 2007, BHD took out a second mortgage through World Savings Bank. Both mortgages were properly recorded. BHD constructed a residence on the Property during its ownership.

BHD conveyed the Property to Victor D'Angelo … on April 23, 2008. D'Angelo occupied the Property and attached residence from 2008 until 2016. D'Angelo hired a title insurance agent to carry out a title search for the Property. The title search did not show any third-party rights, fraud, or *lis pendens* on the Property's title. D'Angelo paid all property taxes while he owned the Property. He also took out three mortgages on the Property. No one asserted any claim to the Property or alleged any defect in the title while he owned the Property.

D'Angelo conveyed the Property to the Turchin[s] on May 20, 2016. Prior to the conveyance, the Turchins signed an agreement of sale with D'Angelo. In the seller's disclosure statement, D'Angelo affirmed that he was unaware of any claims to or defects in the title. As part of the sale of the Property, the Turchin[s]

hired Old Republic National Title Insurance Company to conduct a title search. The title search showed no defect in the title.[2]

The Turchin[s] took out two mortgages through … M&T…. The 2017 Mortgage … was fully satisfied, but the Turchin[s] still owe approximately $165,000 on the other mortgage. The Turchin[s] outlaid at least $200,000 in home improvements and remodeling. The Turchins retain possession of the Property.

Ronnie Tingle (hereinafter "Ronnie"), Tingle's brother, held himself out as the executor of Tingle's estate. Despite this, he did not raise an estate for his sister until late April of 2024, after filing a Complaint against … Appellees.

## PROCEDURAL HISTORY

On March 20, 2024, Ronnie … filed an initial [C]omplaint, alleging that he was a representative of the estate of … Tingle.[2] … M&T filed preliminary objections to the Complaint on April 22, 2024, alleging that Ronnie lacked standing to bring the claim. Ronnie then raised an estate for Tingle, and … Appellant was appointed to be the administrator of the [e]state.[3] … Appellant filed an Amended Complaint on May 2, 2024, removing Ronnie's name and substituting his own. The Amended Complaint raised the following grounds for relief: quiet title (Count I); voiding the open mortgages through M&T (Counts II & III); and declaratory relief (Count IV). The Turchin[s] filed an Answer, New Matter, and Counterclaim on May 16, seeking confirmation of their ownership of the Property. [Specifically, the Turchins brought two counterclaims for quiet title, alleging that they were good faith

_____

[2] When the Turchins purchased the Property, they purchased title insurance. N.T., 4/10/25, at 99, 104.

[3] At trial, Appellant explained he "was appointed by the Register of Wills to be the administrator of the [e]state of Martha Tingle" because

[f]rom what I know…, there was a forged deed. Ms. Tingle had passed back in 1995. I believe I spoke with her brother, [Ronnie], who is an elderly gentleman, prior to [my] being appointed as administrator of the estate just seeing if he was okay with [my] being appointed. I was approved by the Register of Wills.

N.T. at 16-17.

purchasers and that the estate did not promptly act on the forged deed to the Turchins' prejudice, and claiming the estate's claims were barred by the doctrine of adverse possession. They also brought a counterclaim for unjust enrichment in the event the estate would prevail on its claim to title to the Property.] … M&T filed an Answer, New Matter, and Counterclaim on May 22, seeking [declaratory relief confirming its mortgage is a valid lien on the Property based on the doctrine of laches and, if its mortgage were to be cancelled, seeking an equitable lien]. … Appellant filed Answers and New Matters to the Counterclaims on June 9 and 10, respectively. The Turchins and M&T filed Replies to the New Matter on June 25 and 26, respectively.

> [2] Ronnie identified himself as the "sole heir" to Tingle's [e]state in the original Complaint's caption.

Trial was held on April 10, 2025. [Appellant, D'Angelo, and the Turchins each testified; Ronnie was not called to testify.] …

On May 15, 2025, the [c]ourt entered its Findings of Facts and Conclusions of Law, as well as an order finding in favor of [Appellees and entering judgment in their favor].[4] [In its Findings of Facts and Conclusions of Law, the trial court determined the Turchins are *bona fide* purchasers and have clear title. ***See*** FFCL at ¶ 19. The trial court also ascertained the doctrine of laches applies in this case, where Appellant's lack of due diligence to timely institute an action resulted in prejudice to the Turchins. ***See id.*** at ¶ 20.[5]] Notice of the [c]ourt's decision

---

[4] ***See*** Order, 5/15/25 ("[U]pon consideration of the [t]rial held on April 10, 2025, and pursuant to the foregoing Findings of Facts and Conclusions of Law, it is hereby **ORDERED AND DECREED** that [j]udgment is entered in favor of the [Turchins] and [M&T], and against [Appellant].") (emphasis and capitalization in original).

[5] In its subsequent Pa.R.A.P. 1925(a) opinion, the trial court stated its May 15, 2025 order "find[s] in favor of [Appellees] on all counts." Trial Court Opinion ("TCO"), 9/2/25, at 4. However, the record does not support this statement. The trial court did not specifically address each of the counterclaims filed by the Turchins and M&T in its Findings of Facts and Conclusions of Law, and some of the counterclaims were only relevant in the event Appellant succeeded on his claim to title of the Property. Thus, we do not consider this statement to accord with the Findings of Facts and
*(Footnote Continued Next Page)*

was sent to the parties on May 15. … Appellant filed a timely post-trial motion on May 27, 2025.[4]  On June 4, 2025, the [c]ourt entered an Order denying … Appellant's motion[ and entering judgment in favor of Appellees, which] was docketed on June 5.[6] … Appellant appealed … on June 6, 2025.[7]  Before the [c]ourt could enter an order directing him to do so, … Appellant filed a Statement of Errors Complained of on Appeal [pursuant to Pa.R.A.P. 1925(b),] on June 6….[8]  [The trial court subsequently issued a Rule 1925(a) opinion.]

> [4] Although this was twelve days after the [c]ourt's Order, the tenth day fell on the Sunday [preceding] Memorial Day. May 27 was the first day [c]ourts were open after the weekend.

TCO at 1-4 (internal citations and footnote omitted).

Appellant raises the following issues for our review:

1. Did the trial court err when it found that a forged deed was not void as a matter of law?

_____

Conclusions of Law entered by the trial court, upon which the May 15, 2025 order was based.

[6] *See* Order, 6/5/25 ("[U]pon consideration of [Appellant's] [p]ost-[t]rial [m]otion, and [Appellees'] answer thereto, it is hereby **ORDERED and DECREED** that said [m]otion is **DENIED**.  It is further **ORDERED** that [j]udgment is entered in favor of [Appellees].") (emphasis and capitalization in original).

[7] We consider Appellant's June 6, 2025 notice of appeal to be taken from the trial court's June 5, 2025 judgment entered with its disposition of his post-trial motion, instead of the trial court's May 15, 2025 judgment entered with its Findings of Facts and Conclusions of Law.  While Pa.R.Civ.P. 1066 permits trial courts in certain circumstances to enter judgment in favor of the plaintiff simultaneously with its non-jury decision in quiet title actions, the trial court's May 15, 2025 judgment does not accord with this rule; therefore, we consider the May 15, 2025 judgment to be premature.  *See* Pa.R.Civ.P. 1066 (addressing form of judgment or order).

[8] On June 10, 2025, the Turchins filed a praecipe to enter judgment.  We consider it a legal nullity, as the trial court had already entered judgment when disposing of Appellant's post-trial motion.

2. Did the trial court err when it determined that all deeds after a forged deed are valid?

3. Did the trial court err when it determined that … [the Turchins] were *bona fide* purchasers for value with clear title to the [P]roperty when there was a clear, prior forged deed?

4. Did the trial court err when it determined that [the] [e]state of … Tingle had a duty to investigate, search for a document it did not sign, and otherwise review the City of Philadelphia's property records?

5. Did the trial court err when it determined that Appellant was required to produce a non-party witness, who was equally available to Appellees?

6. Did the trial court err when it determined that Appellant was required to explain why a nonparty witness was not present at trial?

7. Did the trial court err when it determined that laches bars Appellant's right to recover the Property due to a forged deed?

8. Did the trial court err when it determined that the Turchins suffered prejudice?

Appellant's Brief at 9-10 (italics added).[9, 10]

_____

[9] The Turchins filed an appellee's brief, and M&T filed a letter stating it adopts and joins the Turchins' brief.

[10] The Turchins' exhibits from trial, along with Appellant's exhibit 13, were not included in the certified record transmitted to this Court on September 3, 2025. The Turchins subsequently filed a supplemental reproduced record containing the trial exhibits, after noting Appellant did not serve a designation of the contents of the reproduced record on them and failed to include the trial exhibits in the reproduced record he filed. *See generally* Pa.R.A.P. 2154 (addressing designation of contents of reproduced record). While we do not condone exhibits missing from the certified record or Appellant's noncompliance with Rule 2154, our review has not been hampered, and we are able to address Appellant's issues despite the omission of these exhibits from the certified record. *See also Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (stating, where the accuracy of a document contained in the reproduced record is undisputed, it may be considered even though it was not contained in the certified record transmitted on appeal).

Because Appellant's issues are interrelated, we address them together. Even if the Turchins were *bona fide* purchasers, Appellant argues the forged deed, and all subsequent transfers flowing from the forged deed, are void and ineffective to transfer title. ***Id.*** at 19, 20-23. With respect to the doctrine of laches, Appellant contends he acted promptly after discovering the forged deed and insists Tingle's estate did not have a duty to continuously review the City of Philadelphia's property records and search for a document it had no idea existed. ***Id.*** at 23-25, 27-29; ***see also id.*** at 19 (Appellant's claiming the recording of a forged deed does not provide constructive notice of a conveyance of an interest in real property); N.T. at 27 (Appellant's stating he became aware of the forged deed in the spring of 2024, when he was appointed the administrator). Regarding any prejudice to Appellees, Appellant says the court could award money damages to them for any alleged improvements made to the Property and points out the Turchins had title insurance. Appellant's Brief at 30-31. To the extent the trial court determined Ronnie was a critical witness not equally available to both sides and drew the inference Ronnie's testimony would be unfavorable to Appellant after he was not called at trial, Appellant claims it was Appellees' burden to establish the doctrine of laches applied, and argues Appellees were free and able to present Ronnie at trial through the use of subpoena or otherwise. ***Id.*** at 25-26.

In entering judgment in favor of the Turchins, the trial court concluded Appellant's claims based on the forged deed were barred by the doctrine of laches. This Court has explained:

The doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim that those who sleep on their rights must awaken to the consequence that they have disappeared. The question of whether laches applies is a question of law; thus, we are not bound by the trial court's decision on the issue. The question of laches itself, however, is factual, and is determined by examining the circumstances of each case.

We have outlined the parameters of the doctrine of laches as follows:

> Laches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. Thus, in order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay.

*Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014) (cleaned up).[11]

Appellees have met this burden. First, Appellees have established a

delay arising from Appellant's failure to exercise due diligence in asserting a

---

[11] Appellant does not argue that the doctrine of laches was not available as an affirmative defense in this property dispute. Instead, as set forth *supra*, Appellant contends the doctrine of laches does not apply because Appellees have not shown an unreasonable delay and prejudice. Appellant's Brief at 27-32. Nevertheless, our research shows the doctrine of laches has previously been considered by courts in quiet title actions and cases involving claims of forgery. *See Hicks v. Saboe*, 555 A.2d 1241 (Pa. 1989) (assessing application of doctrine of laches in case involving forged deed); *Ziminsky v. Ziminsky*, 231 A.2d 904, 907 (Pa. 1967) ("[T]he defense of laches is applicable in actions to quiet title[.]") (citation omitted); *Lomax v. Sullivan*, 282 A.3d 790, 796 (Pa. Super. 2022) (determining the plaintiff's quiet title action was properly dismissed based upon the doctrine of laches); *Warehouse Builders & Supply Inc. v. Perryman*, 257 A.2d 349, 351 (Pa. Super. 1969) (noting the plaintiff's delay in claiming forgery made him "guilty of laches and estops him from asserting against the assignees whatever right he might have had against the assignors … if action had been taken immediately upon his alleged knowledge of the forgery").

claim based on the forged deed. As the trial court and the Turchins advance, the estate waited almost 30 years before raising the estate and nearly 19 years after the forged deed before filing this action and indexing it as a *lis pendens* against the Property. **See** TCO at 14-15; Turchins' Brief at 25. Thus, Appellees have demonstrated a delay.

Appellees have also shown this delay arose from the estate's lack of diligence. "The question of whether a party exercised due diligence in pursuit of a claim is not what a party knows, but what the party may have known by the use of information within their reach." **Kern v. Kern**, 892 A.2d 1, 9-10 (Pa. Super. 2005) (cleaned up). The trial court observed Appellant proffered no explanation for the delay:

> [Appellant] could not explain why Ronnie waited almost thirty years to open an estate for Tingle. He also did not know when Ronnie became aware of the relationship between the [e]state and the Property or the fraudulent deed. Although [Appellant] himself became aware of the Property when he was named Administrator of the [e]state, the current action was instituted prior to his appointment, and thus, the [c]ourt is unconvinced of the argument that because [Appellant] did not know until his appointment as Administrator, it would follow that Ronnie also did not know until the time when he filed a case approximately two months prior to raising the estate.

FFCL at ¶ 22; **see also** N.T. at 28 (Appellant's stating the only personal knowledge he has about the Property, besides the publicly recorded documents, is that Tingle and Williams owned the Property).[12]

_____

[12] Given Appellant's lack of explanation for the delay, the Turchins suggest it is possible the estate knew of the forged deed "shortly after its execution, but
*(Footnote Continued Next Page)*

Aside from the deeds and mortgages that were recorded following the forged deed, the trial court and the Turchins also point out the construction of the residence on the vacant lot was visible to the public in general. *See* FFCL at ¶ 22; Turchins' Brief at 37. The Turchins assert "[a] simple walk or drive past the Property at any time after 2008 would have shown the erection of the residence and the fact that the Property was occupied." Turchins' Brief at 37; *see also* FFCL at ¶ 22 (similarly noting that, in addition to the deeds and mortgages that were recorded following the forged deed, "a large construction project was undertaken on the Property during BHD['s] ownership"). Nevertheless, no action in response to the forged deed was taken at that time.

Finally, even accepting *arguendo* that the estate only recently learned of the forged deed, the Turchins discern "no one … took the steps necessary to raise an estate for Tingle for almost 30 years after her death, probably due to the fact that the heirs understood there was no value in doing so when the only asset of the [e]state was a vacant lot subject to substantial unpaid taxes and municipal claims." Turchins' Brief at 36. Instead, the Turchins claim the estate "buried its head in the sand while third parties paid all of the taxes and other expenses associated with the Property, erected a three-story residence on the Property, made … improvements to the Property[,] and generally

_____

chose not to take any action because the then vacant lot was of minimal value and was subject to substantial unpaid taxes which probably exceeded the value of the vacant lot, making any pursuit of a claim to the Property fruitless for Tingle's heirs." Turchins' Brief at 33; *see also* TCO at 1 (stating Williams and Tingle ceased making tax payments in 1985).

- 10 -

exercised all of the rights, and fulfilled all of the obligations, of home ownership." *Id.* The Turchins insist even the exercise of minimal due diligence would have disclosed the many conveyances of the Property following Tingle's death. *Id.* at 37; *see also* TCO at 14-15 ("There was no explanation provided during trial to explain why Ronnie delayed raising the [e]state and is only now asserting the claims against … Appellees when he could have been aware of the information within his reach for decades before he filed the present case.").

Based on the foregoing, Appellees have demonstrated Appellant lacked due diligence in failing to promptly initiate this action. Appellant presented no evidence to meaningfully counter or refute Appellees' arguments.[13]

_____

[13] Because Appellant did not call Ronnie to testify, the trial court drew the inference his testimony would have been unfavorable to the estate. *See* TCO at 10-11 (referencing *Bentivoglio v. Ralston*, 288 A.2d 745, 748 (Pa. 1972) ("Generally, if a litigant fails to call a witness who presumably would support his allegation, the opposing party is entitled to have the jury instructed that it may infer that the witness, if called, would testify adversely to the party who failed to call him. But this rule is inapplicable if such witness is equally available to both sides of the litigation. In other words, the inference is permitted only where the uncalled witness is peculiarly within the reach and knowledge of only one of the parties.") (cleaned up)). The trial court also noted Appellant did not provide a reason for his failure to call Ronnie. *Id.* at 11 ("If an essential witness is only available to one party and is not called, that party may avoid an adverse inference by providing a valid reason that the witness did not testify.") (citation omitted). Appellant complains this was error, suggesting Appellees knew of Ronnie and could have called him as a witness. Appellant's Brief at 25-26. However, regardless of whether the trial court improperly determined Ronnie was not equally available to both sides and Appellant had to explain his absence, the trial court — as the finder of fact in the non-jury trial — had the authority to weigh the evidence, make credibility determinations, and draw reasonable inferences from the evidence
*(Footnote Continued Next Page)*

Second, Appellees have demonstrated prejudice resulting from the delay. "The party asserting laches as a defense must present evidence demonstrating prejudice from the lapse of time." *Fulton*, 106 A.3d at 134 (cleaned up). "Prejudice may be shown if relevant records have disappeared, if a key witness is now deceased, or cannot be located, or if the defendant changed his position based on the expectation that [the] plaintiff did not intend to pursue the claim." *Id.* (cleaned up). *See also Village of Four Seasons Ass'n, Inc. v. Elk Mountain Ski Resort*, 103 A.3d 814, 823 (Pa. Super. 2014) ("A defendant raising laches must show that because of delay in enforcing a right, some change has occurred to the prejudice of the defendant, which makes inequitable the enforcement of the plaintiff's claim.") (cleaned up).

In finding prejudice, the trial court weighed that "[b]oth Turchins testified … they would not have purchased the Property if they had known there was a potential defect in the title." FFCL at ¶ 24. The trial court found the Turchins' renovations to the Property "greatly increased" its value, TCO at 15, and acknowledged the Turchins would "have to find another home, potentially giving up [Robert] Turchin's simple commute[ to work], and outlay more money to renovate a new property to the same specifications they have

presented. As such, the trial court was free to credit Appellees' reasoning for why the estate delayed bringing this claim, as well as consider the lack of any conflicting reasonable explanation proffered by the estate. *See Fulton*, 106 A.3d at 131 ("The question of whether laches applies is a question of law…. [T]he question of laches itself … is factual….") (citation omitted).

already established in the Property." FFCL at ¶ 24.[14] The trial court considered "the housing market has inflated since 2016 when the Turchins bought the Property, and current housing costs would make it nearly impossible to purchase a similar or nearby property with the money they would receive from the title insurance company." TCO at 13; *see also id.* at 15 (suggesting "[i]f the Turchins lost the Property, their overall commuting time, gas, and storage/parking fees would substantially increase").[15] The trial court further recognized the Turchins "have taken out multiple mortgages on the property, with one still outstanding with M&T." FFCL at ¶ 24. The trial court noted, even if title insurance reimbursed the Turchins for the purchase

_____

[14] At trial, Lynn Turchin detailed the extensive renovations she and her husband undertook at the Property, saying she put her "heart and soul into this house making it ours[,]" and called the Property "our forever home where we want to spend the rest of our lives." N.T. at 97; *see also id.* at 91-93 (Lynn Turchin's recounting they put in a built-in library with a fireplace; extended the patio; replaced fencing; put in a new HVAC unit; customized all of the closets in the house; replaced every window treatment and piece of lighting; added recessed lighting; installed a new garage door and 15 heavy-duty metal shelves in the garage; renovated the laundry area; replaced kitchen appliances; built a wine rack and bay window area in the kitchen; ripped out the bathtub in the master bathroom, retiled, and installed a large glass door; replaced all shower heads; replaced crown molding; replaced the roof twice; and installed a roof deck). She relayed the Turchins spent a minimum of $200,000 on these renovations. *Id.* at 93. In addition, Robert Turchin said he walks to work from the Property and the Property "is where I plan to die." *Id.* at 100, 103. He explained it would be "devastating" if his home was taken away, and he indicated this case is not about money to him but rather "about … keeping my house." *Id.* at 103, 105.

[15] In 2016, the Turchins paid $613,700 for the Property. FFCL at ¶ 17. At the time of trial, Appellant acknowledged the Property was probably worth about a million dollars. N.T. at 47.

price of the Property, "they would still be responsible for paying the balance of the $165,000 mortgage held by M&T…, while forfeiting the use and enjoyment of the renovations made with that money." TCO at 15; *see also id.* at 13. The trial court also determined the Turchins have paid all taxes, utilities, and expenses for the maintenance of the Property since May 2016. FFCL at ¶¶ 10(g), 12.

Appellant suggests, however, the Turchins did not suffer prejudice because money damages and/or title insurance can compensate the Turchins for the purchase price of the Property, the improvements made to the Property, the outstanding mortgage, and the real estate taxes and other expenses they have paid over the years. *See* Appellant's Brief at 29-32. He says the trial court can order an equitable lien on the Property to the extent the Turchins' expenditures increased the Property's value and notes such enrichment is measured by the benefit to the owner (*i.e.*, the estate), not the value of labor and materials expended. *See id.* at 24, 31.

In support of this argument, Appellant cites *Hicks*, *supra*. There, in 1961, a husband forged his estranged wife's signature on a deed which conveyed their jointly owned property to the husband as sole owner. *Hicks*, 555 A.2d at 1243. In April 1977, the husband unilaterally sold the property to the buyers. *Id.* The wife learned of the forgery in September 1979, but took no action until February 1983, when she initiated an action against the buyers for recission of the deed and reconveyance of the property. *Id.* at 1242-43. Following trial before an equity chancellor, the chancellor concluded

the doctrine of laches barred the wife's action, asserting her three-and-a-half-year delay in filing suit prejudiced the buyers. *Id.* at 1243, 1244. Among other things, the chancellor determined the buyers were prejudiced because they continued expending money and labor on the property which increased its value while the wife delayed filing suit. *Id.* at 1245. Our Supreme Court rejected this claim, explaining the delay was not prejudicial to the buyers because the buyers could be compensated by an award of money damages against the wife to reflect the increase in value. *Id.*

We find **Hicks** distinguishable. In that case, the wife delayed filing suit for three-and-a-half years after she learned of the forged deed, whereas the trial court found the estate's delay in the case *sub judice* far exceeded that timeframe. **See** TCO at 12, 14-15 (stating the estate inexplicably failed to institute a claim based on the forged deed for approximately 19 years).[16] During the lengthy delay, the Property was bought and sold several times, a residence was constructed on the once vacant lot, and — in addition to paying the taxes and expenses for the maintenance of the Property since 2016 — substantial renovations were made by the Turchins to customize the Property to their specifications. **See** footnote 14, **supra** (outlining the extensive

---

[16] We also reiterate Tingle died in 1995, but no estate was raised for her until 2024. In **Hicks**, no similar fact was present, as the wife was a living deed holder asserting a claim to the property.

renovations made by the Turchins).[17]   Besides involving only a three-and-a-half year delay, **Hicks** does not describe the nature and extent of the buyers' improvements to the property in that case, whether any such improvements were personalized to the buyers' preferences in a similar way, and if the location of the property held special significance to the buyers like it does for the Turchins.

Moreover, the wife in **Hicks** did not learn of the forgery until **after** the buyers had already bought the property.  Thus, her three-and-a-half-year delay in filing suit had no effect on the buyers' decision to purchase the property; by the time the wife learned of the forgery, the purchase had already been made.  Here, in contrast, the trial court found the estate's delay **preceded** the Turchins' purchase of the Property.  **See** TCO at 12, 14-15.  As mentioned *supra*, the Turchins testified they would not have purchased the Property if they had known there was a potential defect in the title.  N.T. at 85, 87, 89, 90, 101; **see also** FFCL at ¶ 24.  Because of the estate's delay, the Turchins were prejudiced by unwittingly buying a home with a title issue from which they now face the prospect of displacement.  In other words, they

_____

[17] In applying the doctrine of laches, this Court has previously upheld a finding of prejudice based partly on the expenses the defendants incurred for upkeep, maintenance, and improvements to property over the course of nine-to-eleven years.  **See Fulton**, 106 A.3d at 134-35 (determining, in part, prejudice was caused for purposes of the doctrine of laches where the defendants expended sums relating to the upkeep, maintenance, and improvements to properties during the nine-to-eleven years between the time of the conveyances until the imposition of suit).

changed their position to their prejudice due to the estate's delay. **See Village of Four Seasons Ass'n, Inc.**, *supra*.

Accordingly, Appellees have shown they have been prejudiced by the inaction of the estate. As such, the trial court did not err in finding the doctrine of laches applied to bar Appellant's claims based on the forged deed, and we affirm its judgment entered in favor of Appellees on this basis.[18]

Judgment affirmed.

_____

[18] Given our disposition that Appellant's claims based on the forged deed are barred by the doctrine of laches, we need not address his arguments the trial court erred in finding the Turchins were *bona fide* purchasers with clear title to the Property where the forged deed was void and could not pass title to subsequent purchasers. However, to the extent the trial court determined the Turchins were *bona fide* purchasers and therefore had title to the Property despite the forged deed, we conclude the trial court did not need to reach that issue and do not affirm that aspect of the trial court's judgment. **See** FFCL at ¶ 19; TCO at 7-8. Our determination regarding the application of the doctrine of laches bars Appellant's claims based on the forged deed, and renders moot and/or resolves the counterclaims filed by the Turchins and M&T. Specifically, the Turchins' unjust enrichment claim and M&T's equitable lien claim are moot, as Appellant has not prevailed on his claim to title to the Property. The Turchins' quiet title claims, which seemingly sought to have Appellant file an ejectment action against them, are moot, as the doctrine of laches bars Appellant's claims to the Property based on the forged deed. **See** Pa.R.Civ.P. 1061(b)(1) (stating a quiet title action may be brought "to compel an adverse party to commence an action in ejectment"). Finally, our disposition resolves M&T's declaratory judgment claim that the doctrine of laches bars Appellant from challenging M&T's mortgage lien. Insofar as our reasoning differs from the trial court's rationale, "it is a well-settled doctrine in this Commonwealth that a trial court can be affirmed on any valid basis appearing of record." **Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare**, 299 A.3d 937, 957 n.14 (Pa. Super. 2023) (citation omitted).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/8/2026</u>